UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

———————————————————————————x

A.P.,                                               Case No. 18 Civ. 4661

              Plaintiff,                    **COMPLAINT
                                                    AND JURY DEMAND**

        -against-

UNITED STATES OF AMERICA, CARLOS
MARTINEZ, EUGENIO PEREZ, JOSEPH
NORWOOD, KIMBERLY ASK-CARLSON,
HERMAN QUAY, TOMAS RODRIGUEZ,
D'ANELLO SMITH, and JOHN/JANE DOES 1-10,

            Defendants.

———————————————————————————x

      Plaintiff A.P.[1], by and through her attorneys, Cuti Hecker Wang LLP, for her

Complaint alleges as follows:

## NATURE OF THE ACTION

    1.     In 2015 and 2016, while A.P. was an inmate at the Metropolitan Detention

Center ("MDC Brooklyn"), a federal detention center in Brooklyn, New York, she was raped,

repeatedly, by two lieutenants at the facility, Defendants Carlos Martinez and Eugenio Perez.

---

[1] Plaintiff is using the initials "A.P." in this Complaint in place of her real name. It is necessary to proceed pseudonymously for her privacy as a sexual assault victim. It is also necessary because she fears that her name being disclosed publicly would result in violence against her or her family members by individuals who forced her to participate in drug trafficking. Plaintiff notes that federal prosecutors referred to her under pseudonyms in the indictments of Defendants Martinez and Perez, and that in the criminal proceedings of those defendants, two judges on this Court granted the government's motions *in limine* and permitted A.P. to testify under pseudonyms during those trials. *See United States v. Martinez*, No. 17 Cr. 00281, ECF 34; *United States v. Perez*, No. 17 Cr. 00280, ECF 81 at 3 n.1 (discussing sealed order, ECF 75). Should the Court require Plaintiff to file a motion to proceed under a pseudonym, Plaintiff shall of course comply.

2.     The repeated horrors that Martinez and Perez inflicted on A.P. occurred only as a direct result of the negligence and deliberate indifference of numerous federal officials.

3.     Martinez and Perez used their positions of power as lieutenants to prey on A.P. because they understood they could do so with impunity.  Martinez and Perez chose A.P. as the victim of their repeated attacks because she was in particularly vulnerable circumstances: she spoke little English, received no visits, and was due to be sent to immigration custody upon her release from MDC Brooklyn.  Martinez and Perez both used the lieutenant's office at the facility to sexually assault A.P., because they knew it was isolated during certain times of the week, and because they could monitor the security cameras from that office to ensure that no one came upon and observed them during the abuse.

4.     Martinez and Perez have both been criminally convicted for sexually assaulting A.P. *See United States v. Martinez*, 17 Cr. 00281 (E.D.N.Y.); *United States v. Perez,* 17 Cr. 00280 (E.D.N.Y.).

5.     Defendants were aware of the long history of prison officials at MDC Brooklyn sexually assaulting female inmates, which had resulted in multiple criminal convictions of MDC Brooklyn officials.  Defendants were aware that MDC Brooklyn officials preyed upon female inmates in isolated areas of the facility.  Defendants were aware of substantial problems with the policies, training, reporting systems, and oversight regarding sexual assault at MDC Brooklyn.

6.     Defendants were aware of at least one prior allegation that Martinez himself had sexually assaulted another female inmate in a substantially similar location and manner as he later attacked A.P.  In addition to A.P., Perez sexually assaulted at least five other female inmates at MDC Brooklyn.

7.      Defendants knew or should have known that Martinez and/or Perez would sexually assault A.P. because individual defendants observed or should have observed the particular and unusual circumstances of how, when and where Martinez and/or Perez insisted that A.P. specifically be the one to come to the lieutenant's office (which had no camera, but which allowed someone inside to monitor who was approaching), at specific times/hours, for particular durations, and because they ensured they would be left alone with her.  Defendants also knew or should have known of Martinez's sexual assaults on A.P. after she attempted to inform Defendants through statements that Martinez was a "pig", but remained to frightened to state explicitly that she was being raped by him.  Defendants knew or should have known to intervene and prevent and/or stop further assaults of A.P.

8.      Despite these obvious and open warning signs that A.P. faced a substantial risk of being sexually assaulted by Martinez and/or Perez, Defendants took no action or steps to protect her or to intervene and stop the assaults, including without limitation by ensuring the implementation of policies or procedures to protect A.P. and/or to terminate, discipline, investigate, and/or otherwise supervise or manage Martinez and/or Perez to ensure that each would not sexually assault A.P.

## JURISDICTION AND VENUE

9.      This action arises under the Federal Tort Claims Act, 28 U.S.C. § 2671, *et seq.*, the United States Constitution, *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), and New York common law.

10.     This Court has jurisdiction over the federal claims pursuant to 28 U.S.C. §§ 1331, 1343(a), 1346(b), and *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403

U.S. 388 (1971).  This Court has jurisdiction over the supplemental state law claims pursuant to 28 U.S.C. § 1367.

11.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b).

12.     Plaintiff submitted an Administrative Claim for the claims against the United States of America set forth below to the Federal Bureau of Prisons, which was received by the agency on November 16, 2017.

13.     By letter dated June 27, 2018, the Federal Bureau of Prisons denied Plaintiff's Administrative Claim.

14.     Accordingly, all conditions precedent to a Federal Tort Claims Act action in this court have been met.

## PARTIES

15.     Plaintiff A.P. is an individual who resides in Bronx County, New York.

16.     Defendant United States of America (the "United States") at all relevant times operated the Metropolitan Detention Center in Brooklyn, New York ("MDC Brooklyn"), and employed Defendants Carlos Martinez and Eugenio Perez.  Defendant United States is sued under the Federal Tort Claims Act for the wrongful and tortious acts of its employees and agencies.

17.     Defendant Carlos Martinez was employed by the United States at all relevant times as a Lieutenant at MDC Brooklyn.  At all relevant times, Defendant Martinez acted under color of federal law.  Defendant Martinez is sued in his individual capacity.

18.     Defendant Eugenio Perez was employed by the United States at all relevant times as a Lieutenant at MDC Brooklyn.  At all relevant times, Defendant Perez acted under color of federal law.  Defendant Perez is sued in his individual capacity.

4

19.     Defendant Joseph Norwood was employed at all relevant times by the United States as the Regional Director, Northeast Region of the Federal Bureau of Prisons.  In that role, he had responsibility for overseeing and supervising MDC Brooklyn.  At all relevant times, Defendant Norwood acted under color of federal law.  Defendant Norwood is sued in his individual capacity.

20.     Defendant Kimberly Ask-Carlson was employed by the United States as the Warden of MDC Brooklyn at times relevant to this lawsuit, beginning prior to A.P.'s incarceration there and until in or about December 2015.  In that role, she had responsibility for overseeing and supervising the staff and female inmates at MDC Brooklyn.  Defendant Ask-Carlson acted at all times under color of federal law.  Defendant Ask-Carlson is sued in her individual capacity.

21.     Defendant Herman Quay was the Warden of MDC Brooklyn at times relevant to this lawsuit, from in or around December 2015 until after A.P. was released from MDC Brooklyn.  In that role, he had responsibility for overseeing and supervising the staff and female inmates at MDC Brooklyn.  Defendant Quay acted at all times under color of federal law. Defendant Quay is sued in his individual capacity.

22.     Defendant Tomas Rodriguez was a Special Investigative Services technician at MDC Brooklyn at all times relevant to this lawsuit.  In his roles at MDC Brooklyn, he has responsibility for conducting investigations regarding potential misconduct at MDC Brooklyn. He was also temporarily assigned as a lieutenant at MDC Brooklyn on two occasions, including once while Plaintiff was incarcerated at MDC Brooklyn.  In that role, he had responsibility for overseeing and supervising the staff and female inmates at MDC Brooklyn.  Defendant

Rodriguez acted at all times under color of federal law.  Defendant Rodriguez is sued in his individual capacity.

23.     Defendant D'Anello Smith was a Senior Officer Specialist at MDC Brooklyn at all times relevant to this lawsuit.  In his roles at MDC Brooklyn, he has responsibility for overseeing and supervising staff and female inmates at MDC Brooklyn.  Defendant Smith acted at all times under color of federal law.  Defendant Smith is sued in his individual capacity.

24.     Defendants John/Jane Does 1-10 are officials who either had supervisory authority and/or the opportunity to observe and intervene with respect to the acts of Defendants Martinez and Perez and other staff and female inmates at MDC Brooklyn at the times relevant to this lawsuit, whose names are not known to Plaintiff at this time.  John/Jane Does 1-10 acted at all times under color of federal law.  John/Jane Does 1-10 are sued in their individual capacities.

25.     Plaintiff refers herein to Defendants Norwood, Ask-Carlson, Quay, Smith, and John/Jane Does 1-10 collectively as the "Supervisory Defendants."

## JURY DEMAND

26.     Plaintiff hereby demands a trial by jury on all of her claims in this action.

## FACTUAL ALLEGATIONS

### A.P.'s Incarceration at MDC Brooklyn

27.     From March 2015 until April 2016, Plaintiff A.P. was an inmate at MDC Brooklyn.  Plaintiff was housed at MDC Brooklyn in a unit on the sixth floor.

28.     At all times relevant thereto, A.P. was under the control, confinement, and direction of MDC officers and staff.  She had no freedom or ability to refuse directions from guards or their superiors.

6

29.     A.P. is from the Caribbean, where her family still resides.  She received no visits during her time at MDC Brooklyn, aside from the one visit discussed *infra*.

30.     As a sentenced prisoner at MDC Brooklyn, A.P. was required to work.

31.     A.P. was sometimes ordered to clean offices on the second floor of the building. On those occasions, A.P. would be told while she was in her housing unit that a lieutenant required her to come to the second floor to do cleaning work.  When a lieutenant told A.P. to clean the second floor, she had no choice as an inmate but to go.  She would then be brought by a corrections officer from her housing unit to the second floor, either alone or with another female inmate.

32.     Once the corrections officer had brought A.P. to the second floor and brought her into the lieutenant's office, that officer would typically leave, and A.P. would be overseen by the lieutenant on duty, who had specifically sought out and ensured that A.P. specifically be directed to come clean that floor.

33.     The area on the second floor that Plaintiff was required to clean included the lieutenant's office and several other offices.  The lieutenant's office was a small room with a desk, where the lieutenant on duty at the time would often sit.  The cleaning supplies that A.P. had to use were kept in the lieutenant's office, near the lieutenant's desk.

34.     The desk in the lieutenant's office contained a computer that often showed the camera feeds from various parts of MDC Brooklyn, including the hall outside the lieutenant's office itself.   In other words, watching those feeds allowed an MDC official to be aware if someone was about to approach the office.  There was no camera to record what was happening inside the office.

7

***Defendant Martinez Preys Upon A.P.***

35.     A.P. first encountered Defendant Martinez when she was cleaning the second floor for a different lieutenant.  Referring to A.P., Martinez asked the other lieutenant, "Could I send for her if I needed her to clean for me?"  The other lieutenant told him he could.

36.     Shortly thereafter, in or about the fall of 2015, Martinez began specifically requiring that A.P. be brought to clean the second floor for him.  Martinez generally directed that A.P. come to clean for him on Fridays after 4 or 5 p.m., and on Saturdays and Sundays.  At those times of the week, the second floor was vacant, and no one could see what took place inside the lieutenant's office.

37.     Other MDC staff, John/Jane Does, knew of or should have observed Martinez's specific targeting of A.P. and requiring her attendance at particular hours at the lieutenant's office and ensuring he would be left alone with her.

38.     A.P. spoke little English, and Martinez spoke to her in Spanish, his second language.  At first, Martinez pretended to be nice to A.P. and made small talk when she came to clean.

39.     Martinez made clear to A.P. that he had the power to get her transferred to the other female unit, which was considered to be better for inmates because it included pre-trial detainees, not only sentenced prisoners.

40.     Martinez told A.P. about another female inmate who had been mistreated by a guard, and Martinez told her that that inmate had eventually gotten out of prison because she had "kept quiet" and not reported her problem with that guard.

41.     Martinez also used his access to prison visitor logs to prey upon A.P., telling her at one point that he knew she had not had a single visitor during her incarceration at MDC Brooklyn.

42.     Not long after their interactions began, Martinez began to make A.P. feel uncomfortable by bringing up sexual topics.  For example, while she was getting cleaning supplies in the lieutenant's office one day, Martinez asked A.P. about whether she masturbated, and in what manner.  This embarrassed A.P., and she refused to respond to those questions.

43.     Martinez also told A.P. that, when she went back to her unit, she should masturbate while thinking about him.  This again made A.P. feel embarrassed and ashamed.  She refused to engage with that conversation, and told Martinez that she was married.

44.     After Martinez made those comments, A.P. went to a counselor at MDC Brooklyn and said, using her limited English, that she wanted to stop cleaning the second floor.

45.     One Saturday or Sunday in approximately late November 2015, Martinez again directed that A.P. come to the second floor to clean.  An officer brought her to the second floor, to the lieutenant's office, and left.

46.     Once the officer left, Martinez proceeded to rape A.P. in the Lieutenant's Office. Martinez took out his penis and forced A.P. to perform oral sex on him.  A.P. attempted to physically resist, but Martinez, who is physically much larger than A.P., forced her to continue.

47.     Martinez then stood A.P. up, pulled her pants down, and forcibly penetrated her, without a condom.  Throughout the encounter, A.P. was crying, but Martinez continued to rape her until her ejaculated inside of her.

48.     A.P. felt scared, physically hurt, and emotionally devastated. It was the worst thing that had ever happened to her.

9

49.    When A.P. realized that Martinez's semen was inside of her, she was shocked. She pleaded to Martinez, crying, to get her a morning-after pill so she did not become pregnant as a result of the rape.  After initially refusing, Martinez brought a morning-after pill into MDC Brooklyn later that night and gave it to A.P. in her housing unit.

50.    During the encounter, Martinez made clear to A.P. that he knew no one was coming because he could see the security camera feeds showing the hallway outside, visible on the computer on the lieutenant's office desk.  Afterwards, he told her not to tell anyone, and told her she would have problems if she did.  A.P. understood that to mean that she could be sent to the Special Housing Unit – the "SHU" or solitary unit – or could lose the "good time" she had accrued, which would serve to extend her incarceration.

51.    Afterwards, an officer returned and brought A.P. back to her housing unit on the sixth floor.  When she went to the bathroom in the housing unit, A.P. discovered that she was bleeding from her vagina as a result of the rape.

52.    In another incident, Martinez directed that A.P. be brought to clean, and A.P. was escorted to the second floor by Defendant Smith.

53.    During time period when A.P. was incarcerated, Smith was sometimes assigned to act as an Internal Officer.  In that role, he reported to the lieutenant on duty, who was sometimes Martinez, and his responsibility was to assist the lieutenant in carrying out tasks throughout the building.  On multiple occasions, Martinez specifically requested that A.P. be brought to him to clean, and Smith complied and escorted her to the second floor to Martinez.

54.    Smith was aware that there were no surveillance cameras in the lieutenant's office, and that lieutenants can view footage from various cameras on the computer on the desk in that office.

55.     Smith is a fluent Spanish speaker.

56.     Smith typically remained on the second floor on the occasions when he brought A.P. there.  This time, however, A.P. heard Martinez ask Smith, "Can you do me a favor?" followed by something A.P. did not hear. Smith replied that he would, and proceeded to leave the second floor.

57.     Smith and other John/Jane Does knew or should have known that Martinez was targeting A.P. and ensuring he could be alone with her to sexually assault her.  Smith and other John/Jane Does should have intervened and/or reported Martinez's unusual targeting conduct to prevent the assaults.

58.     Once Smith was gone, Martinez began calling for A.P.  When she did not come to the lieutenant's office, he came to the door of the bathroom that A.P. was cleaning, and said he had about 20 minutes, because he had sent Smith to the west side.  Martinez demanded that A.P. follow him to the lieutenant's office.  A.P. knew what was coming, and so dreaded being raped by Martinez again that she nearly hit him in the head with the mop she was holding.  She restrained herself from doing so only because she assumed that no one would believe her word over Martinez's, and she knew that assaulting a federal lieutenant would result in a very long prison sentence.

59.     Once they arrived in the lieutenant's office, Martinez raped A.P., again.

60.     A.P. felt miserable, powerless, and emotionally devastated.

61.     After Martinez raped her again, A.P. went into the bathroom, and then Smith returned and brought her back to the housing unit.  A.P. did not even clean that day.

62.     A.P. tried to prevent Martinez from violating her in this manner.  But he had power over her, as he was a lieutenant at the prison and she was an inmate.  Moreover, he was

much larger than her, and the lieutenant's office was completely isolated, which is why Martinez utilized that location.

63.     Indeed, on one occasion A.P. physically hit Martinez's hand to try to prevent him from raping her yet again.  A.P. went to the lieutenant's office to get the cleaning supplies, and Martinez physically put his arm in front of A.P. to block her path, then grabbed A.P. and tried to pull her towards him.  Martinez was aware that the other female inmate who had come to clean that day was on the far side of the floor cleaning a different area, and so could not see or hear what happened in the lieutenant's office.

64.     After attempting several times to get Martinez to stop, A.P. struck his hand with hers to get him to stop grabbing her.  Martinez responded by saying, in substance, "You know how much time you could get for hitting a lieutenant, don't you?"  Martinez then grabbed A.P. again and proceeded to grope her while twisting her arm to prevent her from escaping.  Martinez then pulled down her pants and raped her, yet again.

65.     At one point, in an effort to get Martinez to stop raping her, A.P. asked a male friend to come visit her at the prison and to give her a kiss at the start of the visit.  A.P. hoped that Martinez would see the footage on the security cameras, think it was her husband, and stop raping her.

66.     Martinez apparently saw the security footage of A.P.'s friend visiting her (or heard her call to the friend asking him to kiss her at the visit), but it did not stop him.  Martinez continued to rape A.P., and even kissed her, making comments to the effect of, "If that's what you want, I'll kiss you." – again implicitly threatening her by showing how he monitored her and controlled her.

12

67.     Beyond the specific incidents described above, Martinez raped A.P. on a number of additional occasions - at least ten in total.  Martinez always perpetrated these rapes on Friday evenings, Saturdays, or Sundays, and always in the lieutenant's office, where he made sure others were not around.  Nonetheless, there were other John/Jane Does who knew or should have known that Martinez's unusual approach to A.P. was plainly indicative that he was sexually assaulting her.

68.     Eventually, in or about the end of January 2016, A.P. tried again to force Martinez stop the attacks.  This time, A.P. called a female friend and intentionally stated Martinez's personal email address (which contains his name), over the phone.  Martinez had previously told A.P. his personal email address.  A.P. thought it was likely that Martinez would hear his name spoken over the phone, and she hoped it would cause him to stop raping her.

69.     Defendant Tomas Rodriguez, who was working in Special Investigative Services at MDC Brooklyn at the time, heard the phone call.  Rodriguez immediately called Martinez on his cell phone, informed him that A.P. had stated Martinez's name on the call, and let Martinez listen to the recording.

70.     Within a day of A.P. uttering Martinez's name over the phone, Martinez came to her housing unit late at night and ordered A.P. to speak to him in an office there.  Martinez angrily told A.P., in sum and substance, "You know what you did," and asked her, "Why did you do it, you idiot?"  It was obvious that Martinez was angry that A.P. had mentioned his name over the phone.

71.     Martinez then told A.P. that she was going to be investigated, and forcefully instructed her that she had to lie to investigators and say that she had seen his personal email address on a computer screen, rather than the truth, that Martinez had told her his email address.

Martinez emphasized threateningly to A.P. that she could receive more time in MDC Brooklyn as a result of the investigation.

72.     The next day, A.P. was called to the case manager's office to speak with Rodriguez, the Special Investigative Services officer.  Although other prison officials were present, only Rodriguez spoke Spanish, so he asked to speak with A.P. alone.

73.     A.P. told Rodriguez several times, referring to Martinez, "That man is a pig."  She made clear her distaste for Martinez, and her demeanor was extremely nervous.

74.     Rodriguez told A.P., in sum and substance, "If you promise me you're not going to tell anyone else about this, I will tear up these papers and no one else is ever going to ask you about this again."

75.     Rodriguez later testified that he thought Martinez and A.P. might be involved in some type of inappropriate relationship.

76.     Rodriguez knew or should have known that Martinez was engaging in illicit sexual conduct with A.P.

77.     Rodriguez took no steps to follow up with A.P. or to understand why she called Martinez a pig, or otherwise was frightened.  Instead, he only insinuated that she should keep this secret to avoid consequences.  The message was clear: she should not say anything more.

78.     Rodriguez knew or should have known to follow up appropriately during and after his interview with A.P., and thus did not take appropriate steps to prevent further abuse of A.P.

79.     No further investigation was conducted at that time and, upon information and belief, federal officials did not conduct any further investigation into any issues involving Martinez and A.P. until long after she had left MDC Brooklyn.

80. Upon information and belief, no one other than Rodriguez and Martinez listened to the recording of the call. The recording was deleted by MDC Brooklyn officials.

81. When Rodriguez was interviewed by federal investigators, he withheld from them the facts that he had informed Martinez of the phone call in which Martinez's name was mentioned, and played the recording of the call for Martinez. Rodriguez testified that he did not disclose those facts because he was concerned he "would be called a rat and that [he] would have problems at work." Rodriguez effectively admitted that he failed to take reasonable steps and intervene to stop A.P.'s further abuse.

82. After A.P. spoke Martinez's name on the phone call, he did not assault her again for several weeks. One day, shortly before A.P. was scheduled to leave MDC Brooklyn in late April 2016, Martinez ordered A.P. to come clean the second floor. An officer named Nunez brought A.P. to the second floor. Officer Nunez knew or should have known that Martinez had summoned A.P. to the isolated lieutenant's office specifically to sexually assault her.

83. After Officer Nunez had left the area near the lieutenant's office, Martinez began calling for A.P. to come to that office. When she complied, he was standing in the doorway, and grabbed her arm. She attempted to do the cleaning tasks that were required of her, but Martinez proceeded to grope her, to kiss her, and to pull down her pants. A.P. repeatedly pulled her pants back up, but Martinez repeatedly pulled them down. He then forcibly moved her to the desk and raped her, yet again.

84. This final rape was the only time in which Martinez did not ejaculate inside A.P. Instead, he ejaculated on her back, and he explained that he did so because, since A.P. would soon be transferred to immigration custody, she might receive a medical examination, and he did not want his semen to be found.

85.     As with every time Martinez raped her, this incident made A.P. feel terrified and caused her intense emotional and physical pain.

***Perez Preys Upon A.P. and Other Female Inmates***

86.     Defendant Perez, another lieutenant at MDC Brooklyn, also ordered A.P. to clean the second floor on several occasions while he was working.  Prior to April 2016, A.P. had cleaned for Perez approximately twice.  Just like Martinez, Perez spoke to A.P. in Spanish.

87.     One day in or about April 2016, Perez told A.P. to get ready because he was going to direct an officer to bring her to clean late that evening.  Perez specifically asked her to bring with her another inmate, whom he referred to by a Spanish nickname for someone with a lot of hair.

88.     At approximately 10:30 or 11 p.m. that night, an officer came to bring A.P. and a different, second inmate to the second floor.  (The woman Perez had specifically identified was not available at the time.)  The officer left A.P. and the other inmate in the lieutenant's office, where Perez was sitting at the desk.  That John Doe officer knew or should have known that Perez was targeting A.P. and the other inmate specifically to sexually assault them.

89.     After retrieving extra toilet paper, A.P. brought it back to the area in the lieutenant's office where cleaning supplies were kept.  Perez was sitting at his desk, using the computer that could display the security camera feeds.

90.     Perez then said to A.P., in sum and substance, "Do you know what people call me?"  A.P. said no.  Perez said, "People call me 'caballo,'" using the Spanish word for "horse."  Perez then stood up, stepped out from behind the desk, and said, "Look why they call me 'caballo,'" and commented about how many inches long his penis was.

91.     A.P. then looked up and saw that Perez had taken out his penis through the open zipper of his pants.  Perez told A.P. to perform oral sex on him.  A.P. refused.

92.     Perez attempted first to persuade A.P. to do so by offering to bring her chicken wings or Dominican food – clearly indicating that he had done so for other female prisoners in exchange for sexual acts before.  Perez specifically referred to a female inmate who had been caught with a ring during a search, and said that he had bought the ring for her – again clearly indicating that that inmate had performed sexual acts on him.  A.P. continued to refuse.

93.     Perez then grabbed A.P.'s hand and put it on his penis, trying to force her to perform sexual acts on him.  A.P. pulled it away, and said, in sum and substance, "Someone else is already doing what you are trying to do," referring to Martinez's repeated rapes.

94.     A.P. then managed to escape, and went to clean another area on the second floor. Shortly thereafter, the other inmate who had come with A.P. to clean the second floor went to the area around the lieutenant's office to clean.

95.     When A.P. went back to the lieutenant's office, she observed that other inmate kneeling down in front of Perez, performing oral sex on him.  Perez saw A.P. and ordered her to kiss and to sexually touch the other inmate.  A.P. refused.

96.     Perez continued to order A.P. and the other inmate to engage in sexual acts with each other, but A.P. refused, and managed to avoid doing so.

97.     A.P. observed Perez proceed to grope the other inmate and order the other inmate to remove her pants.  Perez then masturbated until he ejaculated.  He then carefully disposed of his semen in a garbage bag.

98.     Afterwards, Perez warned A.P. and the other inmate not to tell anyone about what had happened.

99.     A.P. did not report these repeated sexual assaults to prison officials, because she did not want to be sent to the Special Housing Unit or lose her good time and have her incarceration extended, which she understood would happen based on the threats she received from the individual defendants.  Moreover, she feared that no one would believe her, a sentenced prisoner who spoke little English, over Martinez and Perez, two high-ranking officials at the prison.  Indeed, she had already experienced being brought in by an investigator after she had attempted a call for help by explicitly mentioning Martinez's personal email address, and that investigator ignored her obvious statements and demeanor in which she conveyed both that Martinez was a pig and that she was scared.  Moreover, she saw that other John/Jane Doe corrections officers observed how Martinez and Perez had targeted her and ensured she would be brought to them at specific times to be left alone, and that no John/Jane Doe corrections officers had taken any steps to investigate or otherwise intervene to prevent future assaults.

100.     In a federal indictment that was unsealed on May 24, 2017, Martinez was charged with twenty counts of Deprivation of Civil Rights, Aggravated Sexual Abuse, Sexual Abuse, and Sexual Abuse of a Ward based on his repeated sexual abuse of A.P.

101.     After a trial, a jury convicted Martinez of all charges on January 19, 2018.

102.     In a federal indictment that was unsealed on May 24, 2017, Perez was charged with sixteen counts Deprivation of Civil Rights, Aggravated Sexual Abuse, Sexual Abuse, and Sexual Abuse of a Ward based on his sexual abuse of A.P. and four other female inmates at MDC Brooklyn.

103.     After a trial, a jury convicted Perez of all charges on May 14, 2018.

*Other Instances of Misconduct by Martinez and Perez*

104.    Prior to Martinez and Perez sexually assaulting A.P., the United States and the Supervisory Defendants knew or should have known that there was a substantial risk that A.P.'s constitutional rights would be violated.

105.    As lieutenants, Martinez and Perez had responsibility for (1) operations aspects of the Correctional Department and supervision of corrections officers assigned to given areas of the MDC; (2) providing day-to-day counseling of subordinates and resolving work-related problems; (3) evaluating the performance of subordinates; (4) maintaining order between both officers and inmates; and (5) handling disciplinary matters.

106.    As lieutenants, Martinez and Perez were likewise responsible for conducting rounds at the MDC to identify and deter staff sexual abuse and sexual harassment.

107.    Martinez was also involved in educating MDC staff regarding the Prison Rape Elimination Act ("PREA") protocols and incidents.

108.    Nonetheless, on or about November 22, 2015, Martinez posted a photograph on his Facebook page of two male individuals who were apparently MDC Brooklyn staff members, hugging each other at a bar, with the caption, "It's only PREA when you don't like it."

109.    The United States was aware as far back as 1995 both of Martinez's specific danger to female inmates and of the specific method by which he assaulted them.  Federal prosecutors stated in a letter to the court in Martinez's criminal case:

> As far back as 1995, a female inmate (the "female inmate") at the MDC reported to the Federal Bureau of Investigation ("FBI") that [Martinez] had raped her, describing means similar to those he used in this case, specifically that [Martinez] attacked the female inmate during her cleaning duty. The female inmate further stated that for weeks after the incident, [Martinez] continued to pursue her until he sexually assaulted her a second time. The female inmate also reported that after [Martinez] raped her, he threatened her, stating that if she told anyone about his conduct, she would receive additional jail time. He engaged in similar behavior to ensure the silence of [A.P.], the victim in this case. The

female inmate further stated that [Martinez] instructed her not to tell anyone what happened because there were no cameras to prove her version of events and that because he was a federal officer, it would be his word against hers.

110.    On or about April 7, 2016, Martinez was involved in a road rage incident on FDR Drive in Manhattan in which he allegedly got out of his vehicle and punched a female driver twice before fleeing the scene.  He pleaded guilty to disorderly conduct in or about February 2017.  Upon information and belief, Martinez was permitted to return to work at MDC Brooklyn after that incident, and his final rape of A.P. in April 2016 occurred after the incident.

111.    In approximately November 2015, shortly before Martinez first assaulted A.P., Martinez engaged in a sexual relationship with a female prison official at MDC Brooklyn. Martinez arranged to meet that woman in the lieutenant's office to have sex.  He communicated to that woman that he chose that location because he had access to the security camera system and could watch who was coming and going on that floor.  On one occasion, he called off a planned sexual encounter with the woman because the computer system was down, so he would not be able to monitor the cameras in the lieutenant's office.

112.    Defendant Perez began sexually assaulting female MDC Brooklyn inmates at least as far back as 2013.  Sometime in 2013, Perez sexually assaulted a female inmate.  As with the assaults of A.P. described above, that inmate was brought by another MDC Brooklyn officer to clean the second floor.  Once she came to clean the Lieutenant's Office, Perez would assault her.

113.    In or about January 2015, Perez sexually assaulted another female inmate in the prisoner changing area, an area known by prison officials to be without a camera.

114.     In or about February 2015, Perez sexually assaulted that same female inmate, this time in the Special Housing Unit, where he likewise believed and understood he could do so with impunity.

115.     Even after A.P. was released from MDC Brooklyn, Perez continued to sexually assault female inmates.  Between approximately May and July 2016, Perez sexually assaulted another female inmate who had been brought to the second floor to clean.  Again, Perez waited until the officer who had brought her, as well as the other inmate who had been cleaning, left, and told the inmate that he could monitor the surveillance footage to see if anyone was coming. Perez then proceeded to sexually assault her.  In or about July 2016, Perez again sexually assaulted that same inmate.

116.     In or about September 2016, Perez sexually assaulted two different female inmates, again preying upon them while they were cleaning in the vicinity of the lieutenant's office.

117.     Upon information and belief, the United States and the Supervisory Defendants knew or should have known of these other instances of misconduct by Martinez and Perez, and of danger that Martinez and Perez posed to A.P.

118.     The United States and Supervisory Defendants had ample opportunity to take steps or actions to prevent the assaults on A.P.

***History of Widespread Sexual Abuse at MDC Brooklyn***

119.     In addition to the known history of abuse by Martinez and Perez specifically, the United States and the Supervisory Defendants likewise knew of or should have known of the substantial risk that A.P.'s constitutional rights would be violated based on the widespread history of sexual abuse at MDC Brooklyn.

21

120.     MDC Brooklyn has a long history of sexual abuse, including numerous known instances of prison officials sexually assaulting female inmates.

121.     MDC Brooklyn is overwhelmingly male: out of approximately 1,800 inmates, between a few dozen and approximately 150 are female, depending on the time period.

122.     According to a report by the *New York Times*, "To minimize contact between male and female inmates, the correctional staff tended to let women out of their dormitories for cleaning assignments at odd hours when men were locked in their units.  That led to female inmates often being alone, or in small groups, with male officers during the jail's quietest hours, according to court records and interviews."

123.     Female inmates reported to the *New York Times* that, "During the overnight shift, an entire dormitory of women was sometimes supervised by only a single male correctional officer, who was sometimes in turn, supervised by a male lieutenant . . . ."

124.     Another female inmate reported to the *New York Times* that "it was not uncommon for certain female inmates to get to share in the pizza or wings that correctional workers often ordered for themselves from nearby restaurants" and that "the food was widely perceived as a reward for providing officers with sex."

125.     In or about November 2001, Lieutenant Randy Denjen raped a female inmate at MDC Brooklyn.  As with the assaults of A.P., Denjen preyed upon the female inmate in an isolated area of the facility – in that case an isolation cell for inmates on suicide watch – where he know no one would be around.  Denjen pleaded guilty to causing a prisoner to engage in sexual contact by threatening and placing her in fear.

126.     A 2004 report by the Department of Justice's Office of Inspector General investigated and sustained allegations that male and female inmates had been transported in the

same vehicle from MDC Brooklyn to court, and that a male inmate sexually assaulted a female inmate during such a trip as a result.

127.    In or about 2007, Correctional Counselor Theodore Raines raped and sexually assaulted two female inmates at MDC Brooklyn.  Raines also preyed upon the women in an office, where he apparently believed he could do so with impunity.  Raines threatened to send one of the inmates to solitary confinement if she reported him.  He sexually assaulted the other inmate on approximately eight separate occasions.  Raines pleaded guilty to Sexual Abuse of a Ward.

128.    The Department of Justice Office of the Inspector General's 2009 Report on Preventing Sexual Abuse of Inmates by Staff (the "2009 Report") found that "allegations of criminal sexual abuse and non-criminal sexual misconduct" of inmates by staff "more than doubled from FY 2001 through FY 2008" in the Bureau of Prisons overall, and that "[t]hese allegations increased at a faster rate than either the growth in the prisoner population or the number of BOP staff."

129.    The number of reported assaults was actually much higher, as the 2009 Report found that "Some prisons were not reporting all allegations of staff sexually abusive behavior." For example, the 2009 Report found that, due to language in the BOP's guidance for the sexual abuse prevention program, "some BOP staff members may be confused about the need to report all allegations to the BOP's OIA and the OIG, even those that they believe are unfounded."

130.    The 2009 Report further found that "BOP officials at some prisons are not adequately considering all alternatives for safeguarding prisoners who reported being abused, which can result in fewer incidents of abuse being reported."  In particular, "[i]n some locations, officials routinely placed alleged sexual abuse victims in a special housing unit or a local jail and

then transferred them to another facility to protect them from further abuse." The report noted that this "segregation and transfer can have negative effects on the victims and can reduce their willingness to report abuse and to cooperate in investigations."

131.    Accordingly, the 2009 Report recommended "that the BOP consider alternatives to automatically isolating and transferring prisoners that allege sexual abuse and that the BOP develop procedures to ensure that alleged victims receive appropriate psychological and medical assessments."

132.    Relatedly, the 2009 Report found that "OIG and BOP investigators told us that investigating staff sexual abuse and sexual misconduct poses many challenges that make it difficult to conclude whether sexual abuse or misconduct occurred," including because "[v]ictims of sexual abuse often delay reporting incidents because they do not want to be isolated in the special housing unit and transferred to another prison." It further noted that "[i]nmate victims who report incidents often delay doing so until they have been transferred to another institution for some other reason."

133.    The 2009 Report also found substantial problems with the BOP's staff training and educational materials regarding sexual abuse.

134.    In particular, the 2009 Report found that the BOP's training on "gender-specific issues," such as "cross-gender" abuse of inmates by staff and issues specific to female inmates, were "incomplete and out of date."

135.    The 2009 Report recommended that "BOP revise its self-study course, 'Managing Female Offenders,' to include instruction on the 2006 statutory changes that increased the penalties for sexual abuse of a ward and abusive sexual contact and that require staff members convicted of those crimes to register as sex offenders."

136.    Moreover, the 2009 Report found that "[e]ducational materials provided to prisoners were also outdated and were subject to being misinterpreted to mean that prisoners themselves could be disciplined if they reported abuse committed by staff."

137.    The 2009 Report recommended that the BOP "revise and update the 2005 Sexually Abusive Behavior Prevention and Intervention pamphlet to clarify that inmates will not be prosecuted or disciplined for being the victim of staff sexual abuse" and "to include a practical definition of staff-on-inmate sexual abuse and assault."

138.    The 2009 Report found that "BOP officials have not established a goal of reducing the rate of staff-on-inmate sexual abuse."  The report expressed the belief that "the establishment of measurable goals for reducing staff sexual abuse would signal to the BOP's managers that they will be held accountable for their efforts in preventing and detecting staff sexual abuse, providing victim services, thoroughly investigating and resolving allegations, and ensuring that staff members who sexually abuse inmates are dealt with appropriately."

139.    Accordingly, the 2009 Report recommended that "BOP establish a national goal for reducing staff sexual abuse of federal inmates."

140.    The 2009 Report found that the BOP had not applied sufficient oversight or operational reviews of its sexual abuse prevention program.  The report found that "[r]egular operational reviews could lead to prison improvements, such as posting surveillance cameras in areas known to be the frequent location of instances of sexual abuse to prevent and detect staff sexual abuse of inmates in those locations."

141.    Accordingly, the 2009 Report recommended that the "BOP direct prison officials to conduct operational reviews to assess the strengths and weaknesses of their sexual abuse prevention program."

142.    At Martinez's criminal trial, a federal prosecutor stated in summations that "maybe there's a problem with how things are working" with respect to training at MDC Brooklyn about the Prison Rape Elimination Act, pointing out that one MDC Brooklyn officer who testified, Defendant Smith, could not remember what the "R" in PREA stood for, and that an MDC Brooklyn lieutenant who testified could not remember what PREA stood for at all.

143.    Part of Smith's job responsibilities includes assisting in the training of new officers at MDC Brooklyn.

144.    In July 2013, Nancy Gonzalez, a former Correctional Officer in the male unit at MDC Brooklyn, pleaded guilty to charges stemming from her engaging in a months-long sexual relationship with a male inmate, which resulted in the birth of a child.  In a Sentencing Memorandum, Gonzalez's attorneys represented to a judge of this Court that, during her less than 24 months of employment at MDC Brooklyn, Gonzalez had been sexually involved with at least eight staff members at MDC Brooklyn, including two of the lieutenants there, who were her supervisors.

145.    In a news report in February 2013, Keishada Leftwich, a female guard in the men's facility at MDC Brooklyn described being "degraded and demoralized constantly on a daily basis" due to being a female at MDC Brooklyn, and said that she was on the verge of a nervous breakdown because of sexual harassment by her superior.  Specifically, Leftwich alleged that a lieutenant at MDC Brooklyn bought a BlackBerry for her so she could receive sexual text messages from him, and she alleged that the lieutenant fondled her in the lieutenant's office in October 2010, activating the body alarm that correction officers wear to summon help.  Leftwich – a *corrections officer* – further stated, "There's so much pressure to give in to the abuse. . .  I heard (officers) talking about Nancy[ Gonzalez]'s behind.  The male COs (correction officers)

26

tell the inmates about their relationships with staff and talk to inmates about 'hitting that.'"

Upon information and belief, Leftwich reported those allegations to the Bureau of Prisons and/or

other federal agencies.

146.    In March 2015, the National Association of Women Judges ("NAWJ") Women in

Prison Committee issued a report on the conditions in the women's unit of MDC Brooklyn.  That

report found that the conditions there "clearly fall below the ABA Standards on Treatment of

Prisoners and the UN Standard Minimum Rules for the Treatment of Prisoners."

147.    In a follow-up report in June 2016, the NAWJ stated, "We concluded that in

March 2015, conditions for women at MDC since December 2013 were unconscionable and they

remain so in June 2016."  The June 2016 report elaborated:

> The absence of fresh, clean air, the complete absence of sunlight, and the absence
> of ANY outdoor time and activities are immediate issues which BOP has failed to
> address in any meaningful fashion. As noted in our prior report, these conditions
> violate the ABA Standards on Treatment of Prisoners and the UN Standard
> Minimum Rules for the Treatment of Prisoners.  The few activities arranged for
> families do not address these major deficiencies. MDC Brooklyn is a temporary
> detention facility and is an inappropriate facility to house women or any person
> long term.

148.    In a September 2015 report, the Department of Justice Office of the Inspector

General found that MDC Brooklyn's procedures regarding inmates submitting confidential

complaints regarding sexual abuse were "unclear," and that, in at least one instance, a

confidential complaint made by an inmate about sexual conduct between a staff member and an

inmate, which was addressed to the Captain, was intercepted by the corrections officer about

whom the complaint was made, and that the corrections officer proceeded to identify the inmate

based on handwriting.

149.    According to the BOP Office of Internal Affairs, in each of the three years prior to

A.P.'s incarceration at MDC Brooklyn (2012, 2013, and 2014), allegations of sexual abuse of

inmates by staff were made at MDC Brooklyn at a substantially higher rate than in the Bureau of Prisons system overall. In 2014, on a per capita basis, there were more than twice as many complaints of sexual abuse of inmates by staff at MDC Brooklyn than in the Bureau of Prisons system overall.

150. According to an August 2017 *Washington Post* article, "While testifying at an earlier sexual abuse trial, the person responsible for overseeing the [PREA] standards at MDC did not appear to know that an officer could not legally engage in consensual sex with an inmate – that consent is not possible when one party literally holds the key to the other one's freedom."

151. In another federal indictment that was unsealed on May 24, 2017, yet another MDC Brooklyn officer, Armando Moronta, was charged with Sexual Abuse of a Ward for engaging in unlawful sexual acts with four separate female inmates at MDC Brooklyn in or about May and June of 2016. In November 2017, Moronta pleaded guilty to all charges.

152. Upon information and belief, a number of the other female inmates at MDC Brooklyn who were abused by prison officials were, like A.P., preyed upon because they were in particularly vulnerable circumstances, such as those who spoke little English, received few or no visits, had no upcoming court dates or meetings with attorneys, and/or were due to be sent to immigration custody upon their release from MDC Brooklyn.

153. The United States and the Supervisory Defendants knew or should have known about this history of female inmates at MDC Brooklyn being sexually abused. Indeed, there were overwhelming indicators that an isolated inmate like A.P. would be subjected to abuse.

154. The United States and the Supervisory Defendants knew or should have known of the substantial problems and shortcomings in the training that staff receive regarding sexual abuse, the system for reporting sexual abuse complaints, the treatment of female inmates who

reported sexual abuse, education of inmates about and lack of real opportunities to report sexual abuse, the oversight of the sexual abuse prevention program at MDC Brooklyn and/or the actual violations of rules and procedures by Martinez and Perez and/or propensity of each in assaulting females or engaging in sexually inappropriate and abusive behavior.

155.    The United States and the Supervisory Defendants failed to take actions or implement procedures or policies that would have ensured A.P.'s safety and would have ensured that she not be sexually assaulted.

156.    Defendant Rodriguez knew or should have known that A.P. faced a substantial risk of being sexually assaulted by MDC Brooklyn officials, including Martinez and Perez in particular.  At a minimum, Rodriguez knew or should have know of this substantial risk by the time he heard A.P.'s recorded phone call and he met with A.P. in or around the end of January 2016.

157.    Defendant Rodriguez failed to take actions to ensure A.P.'s safety and ensure that she not be sexually assaulted.

**FIRST CAUSE OF ACTION**
**(Negligence)**
**(Federal Tort Claims Act)**
**(Against Defendant United States)**

158.    Plaintiff hereby incorporates each of the foregoing paragraphs as if fully set forth herein.

159.    The United States and its employees had a duty of care to A.P. while she was incarcerated at MDC Brooklyn.

160.    Employees of the United States knew or should have known that female prisoners at MDC Brooklyn, including A.P., were likely to be sexually assaulted.

161.    Employees of the United States knew or should have known that Defendants Martinez and Perez were likely to engage in unlawful conduct that injured A.P.

162.    Employees of the United States acted negligently in hiring, training, retaining, and/or supervising Defendants Martinez and Perez.

163.    Employees of the United States acted negligently in failing to take reasonable steps to prevent female prisoners at MDC Brooklyn, including A.P., from being sexually assaulted.

164.    Employees of the United States knew or should have known that Martinez and/or Perez was targeting A.P., and observed or should have observed that Martinez and/or Perez was requiring her to be brought to each of them at specific/unusual times and being left alone in an unusual manner, such that they knew or should have known to report the behavior, investigate further and/or otherwise intervene to prevent further sexual assaults.

165.    Employees of the United States were acting within the scope of their employment when they engaged in these negligent acts and/or omissions.

166.    As a result of that negligence, A.P. was sexually assaulted by Defendants Martinez and Perez, and suffered damages, including severe emotional harm and physical injuries.

**SECOND CAUSE OF ACTION**
**(Negligent Infliction of Emotional Distress)**
**(Federal Tort Claims Act)**
**(Against Defendant United States)**

167.    Plaintiff hereby incorporates each of the foregoing paragraphs as if fully set forth herein.

168.    The United States and its employees had a duty of care to A.P. while she was incarcerated at MDC Brooklyn.

169.    Employees of the United States breached that duty by negligently failing to take reasonable and necessary steps to protect A.P. from being sexually assaulted, including by failing to intervene and prevent any assault and/or further assaults.

170.    That breach directly exposed A.P. to an unreasonable risk of bodily injury, caused her to fear her own safety, and resulted in her being sexually assaulted by Defendants Martinez and Perez.

171.    Employees of the United States were acting within the scope of their employment when they negligently inflicted emotional distress on A.P.

172.    As a result of Defendants' acts and omissions, A.P. suffered damages, including severe emotional harm and physical injuries.

### THIRD CAUSE OF ACTION
### (Intentional Infliction of Emotional Distress)
### (Federal Tort Claims Act)
### (Against Defendant United States)

173.    Plaintiff hereby incorporates each of the foregoing paragraphs as if fully set forth herein.

174.    By sexually assaulting A.P., Defendants Martinez and Perez engaged in extreme and outrageous conduct.

175.    Defendants Martinez and Perez acted with the intent to cause, and/or disregard of a substantial probability of causing, severe emotional distress.

176.    As a direct result of the actions of Defendants Martinez and Perez, A.P. suffered severe emotional distress.

177.     Defendants Martinez and Perez were acting within the scope of their employment when they intentionally inflicted emotional distress on A.P.

178.    As a result of Defendants' acts and omissions, A.P. suffered damages, including severe emotional harm and physical injuries.

### FOURTH CAUSE OF ACTION
### (Assault)
### (Federal Tort Claims Act)
### (Against Defendant United States)

179.    Plaintiff hereby incorporates each of the foregoing paragraphs as if fully set forth herein.

180.    Defendants Martinez and Perez engaged in physical conduct that placed A.P. in imminent apprehension that they would harm her.

181.    Defendants Martinez and Perez acted within the scope of their employment for the United States when they assaulted A.P.

182.     As a result of Defendants' actions, Plaintiff suffered damages, including severe

emotional harm and physical injuries.

### FIFTH CAUSE OF ACTION
### (Battery)
### (Federal Tort Claims Act)
### (Against Defendant United States)

183.     Plaintiff hereby incorporates each of the foregoing paragraphs as if fully set forth

herein.

184.     By sexually assaulting A.P., Defendants Martinez and Perez intentionally

subjected her to bodily contact that was offensive in nature.

185.     Defendants Martinez and Perez acted within the scope of their employment for

the United States when they battered A.P.

186.     As a result of Defendants' actions, Plaintiff suffered damages, including severe

emotional harm and physical injuries.

### SIXTH CAUSE OF ACTION
### (Cruel and Unusual Punishment)
### (Eighth Amendment / *Bivens*)
### (Against Defendant Martinez, Defendant Perez, Defendant Rodriguez,
### and the Supervisory Defendants)

187.     Plaintiff hereby incorporates each of the foregoing paragraphs as if fully set forth

herein.

188.     By sexually assaulting A.P., Defendants Martinez and Perez violated her right to

be free from cruel and unusual punishment.

189.     The Supervisory Defendants knew or should have known that there was a high

degree of risk that female inmates, and A.P. in particular, would be sexually assaulted by staff at

MDC Brooklyn, and by Defendants Martinez and Perez in particular.

33

190.   Defendant Rodriguez knew or should have known that there was a high degree of risk that A.P. would be sexually assaulted by staff at MDC Brooklyn, and by Defendants Martinez and Perez in particular.

191.   The Supervisory Defendants and Defendant Rodriguez nonetheless acted with a deliberate and/or reckless disregard of the risk that A.P.'s Eighth Amendment rights would be violated.

192.   At all relevant times, Defendants Martinez, Perez, Rodriguez, and the Supervisory Defendants acted under color of federal law.

193.   As a result of Defendants' acts and/or omissions, A.P. suffered damages, including severe emotional harm and physical injuries.

**SEVENTH CAUSE OF ACTION**
**(Assault)**
**(New York Common Law)**
**(Against Defendants Martinez and Perez)**

194.   Plaintiff hereby incorporates each of the foregoing paragraphs as if fully set forth herein.

195.   Defendants Martinez and Perez engaged in physical conduct that placed A.P. in imminent apprehension that they would harm her.

196.   Defendants Martinez and Perez were acting outside the scope of their employment for the United States when they assaulted A.P.

197.   As a result of Defendants' actions, Plaintiff suffered damages, including severe emotional harm and physical injuries.

## EIGHTH CAUSE OF ACTION
### (Battery)
### (New York Common Law)
### (Against Defendants Martinez and Perez)

198.    Plaintiff hereby incorporates each of the foregoing paragraphs as if fully set forth herein.

199.    By sexually assaulting A.P., Defendants Martinez and Perez intentionally subjected her to bodily contact that was offensive in nature.

200.    Defendants Martinez and Perez were acting outside the scope of their employment for the United States when they battered A.P.

201.    As a result of Defendants' actions, Plaintiff suffered damages, including severe emotional harm and physical injuries.

## NINTH CAUSE OF ACTION
### (Negligent Infliction of Emotional Distress)
### (New York Common Law)
### (Against Defendants Martinez and Perez)

202.    Plaintiff hereby incorporates each of the foregoing paragraphs as if fully set forth herein.

203.    As lieutenants at MDC Brooklyn, Defendants Martinez and Perez had a duty of care to A.P. while she was incarcerated at that facility.

204.    By sexually assaulting A.P., Defendants Martinez and Perez breached that duty of care.

205.    That breach directly exposed A.P. to an unreasonable risk of bodily injury, caused her to fear her own safety, and resulted in her suffering emotional and physical injuries.

206.    Defendants Martinez and Perez were acting outside the scope of their employment for the United States when they negligently inflicted emotional distress on A.P.

207.    As a result of Defendants' acts and omissions, A.P. suffered damages, including severe emotional harm and physical injuries.

**TENTH CAUSE OF ACTION**
**(Intentional Infliction of Emotional Distress)**
**(New York Common Law)**
**(Against Defendants Martinez and Perez)**

208.    Plaintiff hereby incorporates each of the foregoing paragraphs as if fully set forth herein.

209.    By sexually assaulting A.P., Defendants Martinez and Perez engaged in extreme and outrageous conduct.

210.    In doing so, Defendants Martinez and Perez acted with the intent to cause, and/or disregard of a substantial probability of causing, severe emotional distress.

211.    As a direct result of the actions of Defendants Martinez and Perez, A.P. suffered severe emotional distress.

212.    Defendants Martinez and Perez were acting outside the scope of their employment for the United States when they intentionally inflicted emotional distress on A.P.

213.    As a result of Defendants' acts and omissions, A.P. suffered damages, including severe emotional harm and physical injuries.

WHEREFORE, Plaintiff respectfully requests that judgment be entered against

Defendants as follows:

    a.   Awarding compensatory damages for all emotional distress, humiliation, pain and

        suffering, physical injury, and other harm, in an amount to be determined at trial;

    b.   Awarding punitive damages in an amount to be determined at trial;

    c.   Awarding pre- and post-judgment interest, attorneys' fees and costs pursuant to

        42 U.S.C. § 1988; and

    d.   Awarding such other and further relief as this Court may deem just and proper.

Dated:  New York, New York
       August 17, 2018

                                   CUTI HECKER WANG LLP


                                   By:  /s/ Mariann Meier Wang
                                   Mariann Meier Wang
                                   Daniel Mullkoff
                                   305 Broadway, Suite 607
                                   New York, New York 10007
                                   (212) 620-2603
                                   mwang@chwllp.com

                                   *Attorneys for Plaintiff*